No. 46.—WILLIAM E. POTTS and others, caveators, plaintiffs in error, *vs.* ALONZO P. HOUSE, executor, defendant.

[1.] On appeal from an order of the Court of Ordinary, establishing a will, the burden of proof, as to the capacity of the testator, rests upon the party claiming under the will, and the propounder must go forward on the trial, and is entitled to open and close the argument.

[2.] The opinions of physicians, in relation to the sanity of the testator, are admissible, whether founded on the symptoms and circumstances, as coming within their own observation, or as testified to by others.

[3.] The opinions of the subscribing witnesses to a will, as to the sanity of the testator, are admissible, without stating the facts upon which they are founded.

[4.] The *mere* opinions of witnesses, other than physicians and the attesting witnesses, are not admissible, unless accompanied with the facts on which they are founded; but having stated the appearance, conduct, conversation or other particular facts, from which the state of the testator's mind may be inferred, they are at liberty to express their belief or opinion, as the result of those facts.

[5.] The Court, in its charge to the Jury, should never assume that certain facts are or are not proven; and should the Court feel it to be its duty to intimate its opinion, that there is or is not sufficient evidence to establish a certain matter, it should at the same time instruct the Jury to consider the evidence, and to decide as they shall find the truth to be.

[6.] If a negro interpreter, incapable by law of being sworn, is the only channel of communication between the testator and scrivener who writes the will, and there is no other evidence of the testator's knowledge of its contents, or his assent thereto, than that which is derived through this medium, the will cannot be executed.

[7.] But if the will be written in the presence of the testator, and in a language which he understands, and it is read over to him, and his dictation and approval of the instrument are interpreted by a negro in his hearing, and in the hearing of others interested in its contents, and he signifies no dissent thereto, by signs or otherwise, but on the contrary, is understood to express himself satisfied, the will may be established—especially if it appears to have been made in conformity to the previously declared intentions of the testator, as to the disposition of his property, as to the disposition of his property.

[8.] While, as a general proposition, it is true that *affirmative* testimony should outweigh that which is *negative*, yet this rule of evidence does not apply where some of the witnesses swear that the testator could measure corn, calculate interest and attend to his ordinary business, and others that he could not. The testimony, in both cases, is of the same character.

[9.] It is error in the Court to discredit the testimony of *relatives* as such, relationship being a circumstance only, from which the Jury may infer a bias.

[10.] It is error in the Court, in its charge to the Jury, to intimate doubts as to the competency of legal testimony, which has been submitted to them on the trial, it being calculated to weaken its force in their estimation.

[11.] Neither *eccentricity* nor *imbecility* of mind, nor *extreme old age,* nor being *deaf* and *dumb,* whether from birth, or the calamity be superinduced, nor *incapacity to make contracts* for the purchase and sale of property, are sufficient to invalidate a will.

[12.] The words "*non compos,*" of unsound mind, are legal terms, and import a total deprivation of understanding. If a testator be *non compos,* his will is a nullity, however just and prudent its provisions.

[13.] If the testator be partially deranged, either as to the legatee or subject-matter of his will, he will be considered as wanting sound and disposing mind and memory, as it respects *this particular will,* however unimpeachable his character and capacity in other respects.

[14.] If the testator has capacity to recollect, discern and feel the relations, connections and obligations of family and kindred, his will shall stand, however capricious or unreasonable its provisions.

[15.] Influence in procuring a will to be made, *to be undue,* must amount to moral coercion; it must destroy the free agency of the testator and constrain him to do what is against his will, but what he is unable to refuse; and it is immaterial whether this undue influence be exercised by a negro or a free white person.

[16.] A verdict manifestly in accordance with the weight of the evidence and the justice of the case, will not be disturbed on account of the misdirection of the Judge; but where material testimony has been excluded, erroneous instructions given by the Court to the Jury, and the proof misstated in summing up the evidence, the verdict will be set aside and a new trial granted.

Caveat on appeal, in Troup Superior Court. Tried before Judge HILL, November Term, 1848.

The issue in this case arose upon a caveat to the will of James Potts, senior, propounded for record. The grounds of caveat relied on were—1st. Incapacity to make a will. 2d. Undue influence exerted over him by a negro woman Charity. 3d. That at the time of making the will, he was unable to articulate any sentence so distinctly as to be understood by the person who wrote said writing, and that said negro woman, Charity, pretended to interpret for him, and directed the items of said paper purporting to be a will.

On the trial of the cause on appeal, in the Superior Court of Troup County, November Term, 1848, the Court ruled that the propounder in the will, was the plaintiff in the cause; to which ruling, counsel for caveators excepted.

The paper propounded, was witnessed by John R. Anderson, Blount C. Ferrell and Thomas T. House. By the first item the negro Charity and her two children were bequeathed to the propounder, Alonzo P. House; and by the second item, Lucy, the mother of Charity, was manumitted or set free, as far as the laws of the State would permit. The other clauses of the will disposed of the balance of the testator's property, among his children and grand-children.

Ferrell, the subscribing witness, testified, among other things, that he wrote the will, and that he could not understand the testator distinctly, and relied entirely on the interpretation of the negro woman Charity and James Potts, jr. who alternately interpreted for him. After it was written, he read it over to the testator, and he assented to it.

Anderson, another witness, agreed with Ferrell, as to the indistinctness of the articulation of the testator.

House, the remaining witness to the will, testified that his articulation was plain enough to be understood. All of the witnesses to the will agreed, as to the capacity of the· testator, to make a will.

The counsel for caveators, offered in evidence the testimony of several witnesses, taken by commission, to prove the unsoundness of the mind of the alleged testator; to which counsel for propounders objected, on the ground that they were not experts, and that none but experts, or the witnesses to the will, could testify as to the character and soundness of deceased's mind, and his capacity to make a will and attend to the ordinary affairs of life.

The Court sustained the objection, and counsel for caveators excepted.

The caveators offered in evidence the testimony of a physician of the Botanic practice, and also, Wm. Dougherty, Esq. an attorney of considerable and long practice, to the same point, which was·excluded by the Court, on the same ground, and counsel for caveators excepted.

The Court also ruled out the testimony of sundry witnesses, to prove that the negroes of deceased, and especially Lucy and Charity, had, for many years, exercised influence over him. To which ruling caveators excepted.

The Court charged the Jury, "that to make a will valid, three facts must appear—

1st. That the instrument propounded, contained really the wishes and acts of the testator.

2d. That he had capacity to make a will; and,

3d. That he did it freely and voluntarily.

The law and practice of the Courts have laid down the oaths or affidavits to be taken by the witnesses to a will, to ascertain the existence of these facts. In this case, these affidavits have been taken by the witnesses showing these facts, and which must always be done before the paper can be declared the last will and testament of the deceased, and admitted to record as such. It is contended, on the part of the caveators here, that it has not been shown that the paper writing propounded in this case, is the dictation of James Potts, senior, the testator, but that so far as appears, it is the dictation of a negro woman named Charity, and of others who interpreted for the scrivener. On this point, it is the peculiar province of the Jury to determine, but it is the opinion of the Court, and I so charge you, that it is not necessary that the testator should convey to the scrivener his wishes in words, but that he may do so by motions and signs, provided they be not misunderstood, or even through an interpreter, for a man is not debarred the privilege of making his will, because he has lost his speech. If he makes himself intelligible to the scrivener, it matters not *how*; and who the interpreter is, is matter of no consequence. If the witnesses attesting the will are not, (in the opinion of the Jury,) mistaken in the expressed wishes of the testator, and the Jury also believe, from the consistency of the instrument with common sense and with previously expressed determinations of the testator, founded on sensible reasons for his conduct, such instrument may be set up as a will, without the oath of the interpreter.

To apply these principles to the case before us: Mr. Ferrell, one of the witnesses, and also the scrivener, testifies that he could, with difficulty, have understood some of the words the testator said, but he preferred to rely on the interpretation of the negro woman Charity, and James Potts, junior. Another witness, Mr. Anderson, testifies, I believe, that he did not understand anything the testator said.

But Mr. House testifies that he could understand *all* he said. If you believe that old man Potts conveyed his wishes by signs and motions, and through this negro woman and others who understood him, honestly interpreting to the scrivener, then, in

the opinion of the Court, it is sufficient evidence that it is the act of the testator. To illustrate what I mean, I will analogize this case to that of a foreigner. I will suppose a German in our place, who cannot speak English, and who wishes to make a will. Now, we have a citizen who speaks both languages, (Mr. Kener,) and it would be perfectly competent for this foreign gentleman to convey his wishes to the scrivener, and the witnesses to the will, through the medium of Mr. Kener, as interpreter, though Mr. Kener himself should not become a witness to the will, nor be called to testify on admitting it to probate. If then, in this case, you believe that these interpreters understood the testator, and interpreted honestly, (keeping in mind the testimony of House,) it was competent for the witnesses to receive his wishes, and this portion of the case would be sufficiently made out, (provided you be of opinion there was no misapprehension.) This is either the will of deceased, or of the negro, or of the negro and James Potts together, which you will judge. You will next determine the question of capacity.

The law does not recognise degrees in mind—does not look at its vigor, activity or strength, in the absence of any charge of foul play, but at its regularity. Whether weak by nature or reduced by disease or age, to any degree of feebleness, still, if it be regular, does not amount to disorder or derangement, it may make a will. The mind may be reduced, I cannot say how low, yet, if it peers at all above idiocy, disorder or derangement, and is capable of prompting and dictating, it is of sufficient capacity to make a will, in the absence of fraud or coercion. It may seem to be stupid, torpid and inactive at times, yet, if it does not amount to absolute fatuity and disorder in its action, but is still regular and retains the power of volition and dictation, it does not disqualify a man from making a will.

In this case, if there is any evidence that the mind of James Potts, senior, was at any time insane, it has escaped the ear of the Court, and the Court feels bound to charge the Jury, that it was incumbent on the caveators to establish incapacity, to a reasonable certainty, as the law presumes sanity."

On the question of influence the Court charged, that any person, negro or other person, could persuade another to make a will in their favor, by any fair and honest means, which did not amount to moral coercion—and this coercion must be produced

Potts and others *vs.* House.

by force, moral or physical, menaces, deceit or fraud, of some kind. The influence and persuasion, to vitiate a will, must so completely and fraudulently overpower the mind, as to prevent it from acting otherwise ; must destroy its volition or substitute the volition of another. This influence must be established by the caveators, to a reasonable certainty, before the propounder can be required to repel the charge of its existence. In all the cases read by counsel for caveators, the influence alleged proceeded from the principal legatee in the will. In the case before us, there is no evidence that House ever exerted any influence over the testator; that alleged to have been employed by the negro, does not remedy the defect, and the cases are not strictly parallel. It is all-important, in all cases, that the first suggestings and promptings for drafting a will, should come from the testator, which was not true in the Shankey case. In this case, if the interpreter was instructed by the testator, and the interpreter gave it honestly to the scrivener, the testator, so far as the law presumes, is the first mover in the case.

The Court further charged the Jury, that it was a rule, in considering testimony of witnesses, that a witness who swore affirmatively to a fact, was to be believed before many who swore negatively; as in the case before us, those witnesses who testify that the testator could measure corn, take good care of his property, count interest and attend to his business, were to be believed in preference to those who testified that he could not do these things. The Court charged the Jury, as a further rule, that regard should be had to the relation of a witness to the parties, and the manner of testifying; and that the testimony of witnesses, of only equal credibility, nearly related or connected with the parties in interest, should not have the same weight with the Jury, as the testimony of those who were not so related or connected, and who could have no reasonable bias, and then instanced the case of Mrs. Slaughter in this case, who was shown to be closely related to those who resist the will ; and further stated that he admitted her testimony, with great doubt as to whether it was admissible or not. The Court also charged the Jury, that in this case the witness, Mr. House, if the Jury believe him equally credible, who swears that he understood what Mr. Potts said, is to be believed with due deference to Mr. Ferrell and Mr. Anderson, in preference to them as to the factum or execution of the will by the testator. The

**VOL. VI.**     42

Court charged the Jury, that a will obtained by fair persuasion merely, without practising fraud, deception or moral coercion, was good, no matter by whom persuaded—whether negro, white person or any body else.

In each and all of the several charges of the Court aforesaid, on all the questions aforesaid, to the Jury, the caveators, by their counsel, allege error, and excepted to the same.

The caveators, by their counsel, farther excepted to the judgment and opinion of the Court, in ruling out testimony.

And upon these exceptions error has been assigned.

B. H. HILL, for plaintiffs in error.

1. The caveators tender the issue, are the plaintiffs in the case, and entitled to open and conclude.

2. The opinions of witnesses, other than those to the will, as to the capacity of the testator, are admissible in evidence, when accompanied by the facts upon which they are founded. *Rambler vs. Tryon,* 7 *S. & R.* 90. *U. S. D.* 683, *et passim.* 1 *Stark.* 127. 3 *Ib.* 1707, *note* 2. 13 *Ala. R.* 68 *and* 202. 2 *Iredell,* 78. 3 *Hagg.* 574.

3. If a party cross-interrogate a witness, and receive an answer which does not suit him, he cannot then ask the Court to withhold it from the Jury, on the ground that the question was illegal.

4. The Court has no right to tell the Jury that a certain fact is established by the testimony, when that fact is part of the controversy between the parties, and one of the very points involved in the issue, to be determined by the Jury. The Court then erred in telling the Jury that the facts necessary, in law, to make a will valid, had been shown to exist, by the testimony of the witnesses to the will, in this case. The Court also erred, in charging the Jury that Mr. House testified that he could understand all the testator said.

In a case of suspicions of fraud, incapacity, and undue influence, a mere negative knowledge on the part of the witnesses to the will, is not sufficient to establish capacity, volition, &c. *Ingram vs. Wyatt,* 3 *Eccl. R.* 172 *and* 4. 1 *Bailey,* 482 *and* 235. 1 *Const. R.* 200.

5. The Court erred in telling the Jury that he admitted the

testimony of Mrs. Slaughter, with great doubt as to its admissibility, on the ground of her relationship to the parties. Relationship does not affect the competency of a witness. 1 *Greenlf.* §386. 1 *Stark.* 84. *Monroe vs. The State,* 5 *Georgia R.* 85.

6. Witnesses who testified that the testator could not take good care of his property, do not come within the rule of negative testimony, and the Court below erred in placing them within that rule. 4 *Ga. R.* 295.

7. Interpreters should be produced, or accounted for, on offering for probate a will made by interpretation, especially when the correctness of the interpretation is impeached by the issue. Negro slaves are incompetent in law, to testify in any issue between white persons; nor can their acts and sayings be received indirectly, or through a white person. The Jury can consider no evidence for which a slave is relied on as authority. A will made by the interpretation of a slave is void. *Law of Slavery,* 194.

8. A will made by interrogatories, is viewed with jealousy by the Courts. 1 *Eccl. R.* 34. *Swinburn, part* 2, *sec.* 5. How much greater should that jealousy be, when made by interrogatories *through an interpreter!*

9. The law does recognize degrees in mind. Proof of the *execution* of a will by a person of perfect mind, is sufficient to admit it to record. So, a will made by a person of weak, indolent and imbecile mind, may be admitted to record; but in such case, proof of the factum, spontaneity and volition, must be clear and unquestionable. *Ingram vs. Wyatt,* 3 *Eccl. R.* 172 *to* 178. And when the mental debility of a testator is the consequence of age, there is less presumption of the sanity of the testator at the time of the execution of the will, than when the mental malady is ordinary lunacy. 3 *Starkie,* 1702, *note.*

A testable capacity must be such as will enable the testator to dispose of his property with understanding and reason. 3 *Stark.* 1703, '4, '5. 4 *Eccl. R.* 51, *Marsh vs. Tyrrell.*

A party incapable, from imbecility, of managing his own affairs, cannot make a will. *Ib.*

O. A. BULL, for defendant in error.

1. The propounder of a will, is necessarily the pro-movant; occupies the relation of plaintiff in the cause, and therefore, is en-

titled to open and conclude.    This is demonstrable from the following considerations :

He is the *actor* in bringing the case into Court.

He may dismiss it at any stage of the proceeding, which the caveators cannot do.

The burden of proof rests upon him.

In the English Ecclesiastical causes, he is always named as plaintiff.    *Buckminster vs. Perry,* 4 *Mass. R.* 593.

2. Except the subscribing witnesses to a will, none but experts are competent to testify, as to their opinion of the capacity of a testator.    1 *Phil. Ev.* 290.    3 *Mass.* 330.    *Swinburn,* 72.    4 *Conn. R.* 203.    They must state the circumstances and symptoms. 1 *Phil. Ev.* 290.    9 *Mass. R.* 225.

The Court should first ascertain whether the witness be an expert, either by examining him or others.    2 *Phil. Ev.* 761. *Wright's Case,* 2 *Russ. & Ry.* 456.

Answers to cross-interrogatories, which are asked in consequence of the direct interrogatories, and made dependent on them, are not admissible, if the answers to the direct interrogatories be rejected.    2 *U. S. Dig.* 215.    1 *Sumner's R.* 451.

When complete justice is done, a new trial will not be granted, either for the rejection of legal, or the admission of illegal testimony.    *Garish vs. Beane,* 9 *Mass. R.* 193.    *Graham on New Trials,* 6, 7, 8, 9.

In this case, the testimony rejected is of no importance.

On questions of capacity, the Court will rely little on mere opinion, but form its own judgment from the facts and the conduct of the parties.    2 *Eng. Eccl. R.* 99, 100.

3. The rule requiring the interpreter of a witness speaking a foreign language, to be sworn, does not apply to a case like the one at bar.    The testator is not a witness, and the only question to be determined is, whether the will was dictated by him, and whether he knew its contents.

The circumstances attending the *factum,* exclude the idea of any foreign dictation.

There is no authority for rejecting the will of one who cannot articulate intelligibly.

" Such as be speechless only, and not void of hearing, if they cannot write, may make their testaments by signs, so that the same signs be sufficiently known to such as be present."    *Swin-*

*burn, part* 2, *sec.* 10. *Godolphin, part* 1, *ch.* 11. 7 *Eng. Eccl. R.* 576, '7.

4. Weakness of mind or partial decay of intellect, does not disqualify from making a will, nor does loss of memory from old age. 3 *Johns. Ch. R.* 158. 3 *Peters' Dig.* 704.

There is no proof of influence in this case, and the charge of the Court on this subject, is therefore immaterial.

"The influence to vitiate a will must amount to moral force and coercion, destroying free agency, and not the influence of affection or attachment, or the desire of gratifying the wishes of another." 3 *Eng. Eccl. R.* 254, 260, 261.

Incapacity is never presumed ; it is incumbent on the party asserting it, to establish it by the clearest and most satisfactory proofs. 1 *Wms. on Ex'rs*, 17.

5. Several witnesses testified that he did attend to ordinary business transactions.

*By the Court.*—LUMPKIN, J. delivering the opinion.

This was an issue of *devisavit vel non*, originating in the Court of Ordinary of Troup County, to try the validity of an instrument purporting to be the last will and testament of James Potts, senior, deceased. That Court having decided in favor of the will, an appeal was entered, and the final trial had in the Superior Court of that County, before Judge *Hill*, in November, 1848. The Jury returned a verdict affirming the judgment of the Court of Ordinary, and declaring that the paper propounded, was the last will and testament of James Potts, senior, deceased.

The issue having been thus found against the appellant, after a long and laborious trial, his counsel has caused the record below to be removed to this Court, and now submits for its consideration and decision, numerous questions arising in the proceedings during the trial, all of which we propose to discuss, though not exactly in the order in which they have been presented in the pleadings and the argument.

It is alleged that the Court below erred—

1st. In holding that, on an appeal from an order of the Court of Ordinary, establishing a will, the burden of proof rests upon the executor, who is therefore entitled to go forward on the trial and open and close the argument.

2nd. In excluding the opinion or belief of numerous witnesses in behalf of the caveators, and among the rest a *physician* and a *lawyer*, notwithstanding it appeared that they had opportunities of knowing and observing the state and condition of the testator's mind, and their opinion or belief was accompanied by particular facts, to which they severally deposed, as the reason or foundation thereof.

After the testimony and argument had closed, the presiding Judge delivered a long and lucid charge to the Jury, in which the law relative to the capacity to make a will, and the employment of fraud and undue influence in obtaining it, were fully discussed, and various items of which are excepted to by counsel for the objectors.

It is contended that the Court erred—

1st. In *assuming* that the subscribing witnesses to the will *had proven* the three facts necessary to its validity, namely: capacity, execution and volition.

2d. In *misstating* to the Jury, that Thomas T. House, one of the subscribing witnesses to the will, testified, that he understood *all* that the testator said, and that, therefore, he was to be believed in preference to John R. Anderson and Blount C. Ferrell, the other subscribing witnesses, as to the execution of the paper; no such fact as the one here assumed appearing by the evidence.

3d. In instructing the Jury that a will, made through the medium of an interpreter, might be established without the oath of the interpreter.

4th. In applying the rule which discriminates in favor of *affirmative* over *negative* testimony, to the facts of this case.

5th. In affixing a legal discredit on the evidence of *relatives*, as such.

6th. In expressing great doubt as to the competency of certain testimony which had been admitted before the Jury.

I have endeavored, in this analysis of the case, to condense and simplify it as much as possible.

[1.] The real question to be decided in both Courts in this case was, whether there was a valid will? The executor and those who claim under it, hold the affirmative. They must not only prove, therefore, that the instrument purporting to be a testamentary paper, was formally executed, but, also, that the testator was of sound and disposing mind and memory. The necessity for

this proof imposes the burthen on the propounder, to begin and close ; and when the case is carried up to the Superior Court by appeal, it is to be proceeded with in the same manner as though it had been brought there directly, without having been before any inferior tribunal.   The executor and those who claim under the will, are as much bound to establish it in the Superior Court, after the appeal, as they were before the appeal, in the Court of Ordinary.   In both they take the affirmative.   The *onus probandi* consequently rests upon them, and they are to go forward in discharging that burden.   *Hodges vs. Holder*, 3 *Campb*. 366.   *Jackson vs. Hesketh*, 2 *Stark. Rep*. 518.   *Phelps et al. vs. Hartwell et al*. 1 *Mass. R.* 71.   *Buckminster et al. vs. Perry*, 4 *Mass. R.* 593.   *Brooks vs. Barret*, 7 *Pick*. 94.   8 *Greenl. Rep*. 42.   And this was the rule of the Roman law—*ei incumbit probatio, qui dicit, non qui negat.*

[2.] Whether the ruling of the Court was correct in refusing to permit the witnesses, other than the subscribing witnesses to the will, to give their opinion as to the sanity of the testator, is a question involving considerations and consequences of much delicacy and importance.   I have looked with much anxiety into all of the adjudicated cases within my reach upon this point, and the result of this examination is not very satisfactory.   It seems to be settled, that physicians are allowed to give their opinion *merely* as to the sanity of the testator, from the symptoms and circumstances which come within their own observation, or as testified to by others.   *Hathorn et al. appellants, vs. King, executor*, 8 *Mass. Rep*. 371.   *Lessee of Hodge vs. Fisher et al*. 1 *Peters' C. C. Rep*. 163.   " If the physician who saw him, and who has given testimony respecting his situation, had had an opportunity to examine his case and to form a deliberate opinion upon it, that opinion, pronounced by a man of his acknowledged professional talents, would have been almost conclusive upon this point."   By Judge *Washington*.   Again, "*mere* opinions," says Judge *Washington*, " of witnesses as to mental capacity, are entitled to little or no regard, unless supported by good reasons, founded on facts which warrant them.   To this, as a general rule, the opinions of medical men may be considered as an exception."   3 *Wash. C. C. Rep.* 587.

[3.] The subscribing witnesses to the will may likewise testify as to the opinion they formed of the testator's mind at the time

of executing the will, the law placing them around the testator to try, judge and determine whether he is *compos* to execute it. *Hayward vs. Hagard*, 1 *Bay*, 335. *Powell on Devises*, 69, 71. *Pool et al. vs. Richardson*, 2 *Mass. Rep.* 330.

[4.] But the opinions of witnesses, other than physicians and the subscribing witnesses to the will, considered *merely* as opinions, are not evidence. *Doe vs. Reagan*, 5 *Blackf.* 217. *Clark vs. The State*, 12 *Ohio*, 483. *Needham vs. Ide*, 5 *Pick. Rep.* 510. This latter proposition, although sustained by the current of authorities, has not commanded universal acquiescence; and the distinction between subscribing witnesses and any others who may happen to be present, is certainly not very obvious. The latter are more likely to be free from bias, which naturally will influence the former to support their attestation. It would seem, therefore, *cæteris paribus*, that the testimony of other witnesses should have more weight on account of their being more indifferent. *Vide Dickinson vs. Barber*, 9 *Mass. Rep.* 227. *McKee vs. Nelson*, 4 *Conn.* 355. 1 *Phil.* 275.

This subject has been frequently before the Courts, but no where perhaps so thoroughly, ably and philosophically handled, as by the late Judge *Gaston*, in *Clary vs. Clary*, (2 *Iredell's Law Rep.* 78.) " The first opinion in the Court below," says the Judge, " to which exception has been taken, is the rejection as evidence of the last clause of the deposition of John Beard, wherein the deponent stated, ' that he was impressed with the belief that, as to her mental faculties, Mary Clary was in the state called childish.' To understand the import of this part of the deposition, it must be taken in connection with what precedes it. The substance of the entire deposition is, that the witness had no acquaintance with Mary Clary, other than such as resulted from one occurrence; that about the year 1826, eleven years before the execution of the deed in dispute, he visited her at Daniel Clary's house, in consequence of a message from said Daniel, and for the purpose of writing her will; that he received her directions with respect to the disposition of her property, and wrote the will according to these directions; that he did not attest the will, but left it to be attested by others ; that at this time she appeared to him to be in good health, but he thought her intellect in the state they usually term childish. The objection to

Potts and others *vs.* House.

the rejected part of the deposition was, that it gives the *opinion* of the witness upon the state of Mary Clary's mind.

" It is certainly the general rule, that witnesses shall be examined as to facts whereof they have personal knowledge, and not as to those in regard to which they have no personal knowledge, but have only formed an opinion or belief. But this rule necessarily admits *of* exceptions. There are facts which, from their nature, exclude all positive proof, because they are imperceptible to the senses, and of these no proof can be had except such as is mediate or direct. No man can testify, as of a fact within his knowledge, of the sanity or insanity of another. Such a question, when it arises, must be determined by other than direct proof. The precise inquiry then is, must the evidence be restricted to the proof of other facts, coming within the knowledge of the witnesses, and from which the Jury may draw an inference of sanity or insanity, or may the judgment and belief of the witnesses, founded on opportunities of personal observation, be also laid before the Jury to aid them in forming a correct conclusion? We are not aware of any direct and authoritative decision which supersedes the necessity of recurring to general principles and legal analogies to ascertain what is right.

" In the first place, it seems to us that the restriction of the evidence to a simple narration of facts having, or supposed to have, a bearing on the question of capacity, would, if practicable, shut out the ordinary means of obtaining truth, and if freed from this objection, cannot, in practice, be effectually enforced. The sanity or insanity of an individual may be matter notorious and without doubt in a neighborhood, yet few, if any, of the neighbors may be able to lay before the Jury, *distinct facts* that would enable them to pronounce a decision thereon with reasonable assurance of its truth. If the witness may be permitted to state that he has known the individual for many years; has repeatedly conversed with him, and heard others converse with him; that the witness had noticed that in these conversations he was incoherent and silly; that in his habits he was occasionally highly pleased and greatly vexed without a cause; and that in his conduct he was wild, irrational, extravagant and crazy; what would this be but to declare the judgment or opinion of the witness of what is incoherent or foolish in conversation; what reasonable cause of pleasure or resentment; and what the indicia of sound or disor-

dered intellect? If he may not testify, but must give the sup-
posed silly or incoherent language—state the degrees and all the
accompanying circumstances of highly excited emotion, and spe-
cifically set forth the freaks or acts regarded as irrational—and this
without the least intimation of any opinion which he has formed
of their character—where are such witnesses to be found? Can
it be supposed that those not having a special interest in the sub-
ject, shall have so charged their memories with those matters, as
distinct, independent facts, as to be able to present them in their
entirety and simplicity to the Jury? Or if such a witness be found,
can he conceal from the Jury the *impression* which has been made
on his own mind? And when this is collected, can it be doubted
but that his judgment has been influenced by many, very many
circumstances which he has not communicated, which he cannot
communicate, and of which he is himself not aware?

" We also think that there is an analogy in the investigation of
questions of this kind, and in the investigation of other questions
wherein positive and direct evidence is unattainable, and in which
the rule of evidence is well established. Of this kind are ques-
tions of personal identity and handwriting. Mere opinions, as
such, are not admissible; but where it is shown that the witness
has had an opportunity of observing the *character* of the person,
or ' the handwriting which is sought to be identified, then his
judgment or belief, *framed upon such observation,* is evidence for
the consideration of the Jury; and it is for them to give to this
evidence that weight which the intelligence of the witness, his
means of observation, and all the other circumstances attending
his testimony, may, in their judgment, deserve. And why is this,
but because it is impossible for the witness to specify and detail
to the Jury, all the minute circumstances by which his own judg-
ment was determined, so as to enable them, by inference from
these, to form their judgment thereon. And so it is in regard to
questions respecting the *temper* in which words have been spoken
or acts done. Were they said or done kindly or rudely, in good
humor or in anger, in jest or in earnest? What answer can be
given to these inquiries, if the observer is not permitted to state
his impression or belief? Must a *fac simile* be attempted, so as
to bring before the Jury the very tone, look, gesture and man-
ner, and let them collect thereupon the disposition of the speaker
or agent?

Potts and others *vs.* House.

"In the Ecclesiastical Courts, where questions of sanity and insanity in cases of wills are of frequent occurrence, the practice is to interpose allegations, and admit these allegations to proof, that the general appearance, manners, conduct and deportment of the testator denoted unsound intellect; that he was treated and regarded by his friends and acquaintances as one not in his right senses; and, on the other hand, to receive pleas, and consequently proofs, that he was regarded by his friends and acquaintances as sane; that he was engaged in acts of business, which he conducted without suspicion of unsoundness, and that his general deportment was rational and proper. See *Wheeler vs. Bestford & Alderson*, 3 *Haggard*, 574. In this case it was stated by Sir *John Nicholl*, in pronouncing his judgment, 'there is a *cloud* of witnesses who gave unhesitating *opinions* that the deceased was mad.' He declared, indeed, upon a consideration of all the circumstances of the case, 'their *opinions* are of little weight,' but he did not reject them as inadmissible, nor remark upon them as contrary to the course of the Court. See also the testimony received in the case of *Engleton & Coventry vs. Hingston*, 8 *Ves.* 449.

"It is a well known exception to the general rule requiring witnesses to testify facts and not opinions, that in matters involving questions of science, art, trade or the like, persons of skill may speak not only to facts, but give their opinions in evidence. It is insisted that, by the terms of this exception, persons not claiming to possess peculiar skill, and all persons upon matters not requiring peculiar skill, are excluded from giving opinions. Certainly the testimony rejected in this case cannot claim to be admitted under this exception, and as we understand the exception, it does exclude *mere opinion* in all cases other than those which are embraced within it. Professional men are permitted to testify to the principles and rules of the science, art or employment, in which they are especially skilled, as general practical truths or *facts* ascertained by long study and experience, and also may pronounce their opinion as to the application of these general facts, to the special circumstances of the matter under investigation, whether these circumstances have fallen under their own observation, or have been given in evidence by others.

"The Jury being drawn from the body of their fellow-citizens, are presumed to have the intelligence which belongs to men of good sense, but are not supposed to possess professional skill, and

therefore, in matters requiring the exercise of this skill, are permitted to obtain what is needed from those who have it, and who are sworn to communicate it fairly. Thus, shipmasters have been allowed to state their opinions on the seaworthiness of a ship, from a survey which has been taken by others; physicians to pronounce upon the effect of a wound, which they have not seen; and painters and statuaries to give their opinion whether a painting or statue be an original or copy, although they have no knowledge by whom it was made. This is mere opinion, although the opinion of skilful men. This none but professional men are allowed to give, in matters involving peculiar skill, and none whatever are allowed to give in matters not involving skill; because, with this exception, the Jury are equally competent to form an opinion as the witnesses, and with this exception, their judgment ought to be founded on their own unbiassed opinion. But judgment founded on actual observation of the capacity, disposition, temper, character, peculiarities of habit, form, features or handwriting of others, is more than *mere opinion*. It approaches to *knowledge*, and is *knowledge*, so far as the imperfection of human nature will permit knowledge of these things to be acquired, and the result thus acquired should be communicated to the Jury, because they have not had the opportunities of personal observation, and because in no other way can they effectually have the benefit of the knowledge gained by the observations of others.

"It has also been insisted, that there is a difference between the attesting witnesses to an instrument and other witnesses, as to their competency to express an opinion upon the capacity of the maker. Wherever such a difference has been *intimated*, it seems confined to cases of wills, in which it is said, ' the testator is entrusted to the care of the subscribing witnesses; that it is their business to inspect and judge of the testator's sanity before they attest; that in other cases, witnesses are passive, here they are active and principal parties to the transaction.' Now, we can readily conceive why, *prima facie*, it shall be presumed, that witnesses thus engaged, are more observant than others on whom the duty of observation has not been thrown, and also the propriety of the rule which obtains on the trial of an issue of *devisavit vel non*, that all the attesting witnesses, if to be had, shall be produced and examined before the Jury. But we do not see, (and without sufficient reason or clear authority for such a distinction, we cannot

Potts and others *vs.* House.

admit it,) why the judgment of any witness, actually founded upon such observation, shall not be received in evidence. It is conceded that the attesting witnesses may express an opinion upon the testator's capacity, because as the law has made it their duty to inspect the testator's capacity, the law presumes that they did observe and judge of it. If observation presumed, be a sufficient ground for receiving in evidence the judgment of witnesses supposed to be thereupon formed, it is not readily conceivable that actual observation is an insufficient ground to warrant respect for the judgment of a witness in fact, formed upon it.

"It has been also objected, that the witness whose belief or opinion of mental capacity was in this case rejected, had not the means of forming such a judgment thereon as was proper to be submitted to the Jury. Unquestionably before a witness can be received to testify as to the fact of capacity, it must appear that he had an adequate opportunity of observing and judging of capacity. But so different are the powers and habits of observation in different persons, that no general rule can be laid down as to what shall be deemed a sufficient opportunity of observation, other than that it has in fact enabled the observer to form a belief or judgment thereupon. So it is in the analogous case of handwritings. If the witness declares that he has seen the party write, whether it has been only once or a thousand times, this is enough to introduce the inquiry whether he believes the papers produced to be the party's handwriting? His belief is evidence, the weight of which must depend upon a consideration of all the circumstances under which it was formed. It may be that the judgment of the witness in this case, founded solely upon the occurrences in a single interview, and of which, notwithstanding the general impressions thereby created, he remembers no distinct, marked act of childishness or folly, would have weighed little with the Jury in determining the matter in controversy. But if belief of capacity, founded on personal observation, be evidence, and we think it is, it is admissible, whether the opportunity for observation has been frequent or rare. Whatever might be the weight of the rejected testimony, we hold that the plaintiffs had a right to insist on its being placed in the scales of evidence, and that there was error in the opinion which rejected it."

This extract, we are sensible, has been extended to an unusual length, but it is a just tribute to its intrinsic worth, as well as to

the high standing of its author, who though dead, still speaks and will long continue to speak to the legal world, *as one having au- thority.* Besides, we feel unusually solicitous perhaps, to assign reasons for our judgment upon all the interesting questions in- volved in this issue, which will give satisfaction to the parties and to the profession, in a cause, in many of its features, at least, until now, new in this Court.

In *Morse vs. Crawford,* (17 *Vermt. Rep.* 499,) Judge *Bennett* says, " the law is well settled, and especially in this State, that a witness who is not a professional man, may give his opinion in evidence, in connection with the facts upon which it is founded, and as derived from them, though he could not be allowed to give his opinion, founded upon facts proved by other witnesses."

So also in *Lester vs. the Town of Pittsford,* (7 *Vermt. Rep.* 158,) the Supreme Court of Vermont say, "Testimony of opin- ion may be given, where from the general and indefinite nature of the inquiry, it is not susceptible of direct proof. Thus, upon a question of insanity, witnesses not professional men, may be per- mitted to give their opinion in connexion with the facts observed by them. But this evidence is always confined to those who have observed the facts, and is never permitted where the opinion of the witness is derived from the representation of others. Upon a question of insanity, for instance, witnesses who have observed the conduct of the patient, and been acquainted with his conver- sation, may testify to his acts and sayings, and give the result of the observation."

In *Rambler and another vs. Tryon and others,* (7 *Serg. & Rawl.* 90,) the will of Michael Rambler was impeached on the ground of imbecility of mind of the testator, from his childhood to the hour of his death. The execution of the will was duly proved by the subscribing witnesses, who likewise attested the capacity of the testator—that he was of sound and disposing mind and me- mory. Witnesses were offered to prove certain facts tending to show an extraordinary dulness of understanding, followed up by the opinion of the witnesses, as founded on the facts, who had known Rambler intimately from his childhood to his grave, that he was incapable, from defect of understanding, to make a will. All this evidence was objected to, and the objections overruled and the evidence admitted. "I am at a loss," says Judge *Duncan,* "to perceive any plausible reason to support this objection. I

know not how, otherwise, the alleged imbecility of mind could be proved, than by the evidence of those who grew up with him, who marked his conduct in infancy, in the prime of life and in his decline.   The opinion of witnesses, without stating the ground of such opinion, ought not to be received; but when they state facts indicative of want of common intellect, their opinion is always received.   The weight it ought to have will depend on the solidity of the reasons assigned for the opinion, and the intelligence of the witness.   To confine the proof to the subscribing witnesses to the will, in such a case, would be absurd.   The friends who visit him, the physician who attends him, have equal, if not superior, means of information, to the witnesses who may be called on to attest the publication.   The will of any man would depend too much on the subscribing witnesses, if no others were deemed competent to testify as to the sanity of the testator.   The most spurious instrument would be imposed upon the heir, or the devisee might be deprived of the estate devised, by a conspiracy of the subscribing witnesses.   Such conspiracy is not without a precedent in law.   *Lovel vs. Jolliffe*, 1 *W. Bl.* 365.   Five subscribing witnesses to a will and a codicil, and a dozen of servants of the testator, unanimously swore him to be incapable of making a will.   To encounter this evidence, several of his friends, who had frequently conversed with him during a period of four years, deposed to his entire sanity and more than ordinary intellectual vigor.   The will was established and the testamentary witnesses convicted of perjury.   This evidence was properly received."

In *Gibson vs. Gibson*, (9 *Yerg.* 329,) the Supreme Court of Tennessee emphatically ask, " How can a witness describe the dissociated and flighty conversation of a lunatic, the fear, the horror, the frenzy of his eye ?   How communicate the influences which mind practises upon mind, if he must not speak of inferences, impressions or conclusions ?"

There is good reason, perhaps, why *mere opinions* should not generally be relied on as testimony.   For even where witnesses are upright and honest, their belief is apt to be more or less warped by their partiality or prejudice, for or against the parties.   It is easy to reason ourselves into a belief of the existence of that which we desire to be true; whereas, the facts testified to, and from which the witness deduces his conclusions, might produce a very different impression on the minds of others.   But the wit-

nesses having stated the appearance, conduct, conversation and other particular facts from which the state of the testator's mind may be inferred, they are always at liberty to state their inference, conclusion or opinion, as the result of these facts.

Had the Court admitted the testimony, at the same time instructing the Jury that the facts and circumstances, and not the opinions of the witnesses as to the soundness of Potts' mind, or his capacity to make a will, was the *primary* evidence upon which they must rely in making up their verdict, there might not have been just cause of complaint. But the witnesses on the part of the caveators were not permitted to testify at all as to their opinion or belief. I have scrutinized closely the voluminous testimony adduced on the trial, and find, that in *every* instance, the *facts only* testified to by the witnesses, were allowed to go before the Jury, while the *inferences* derived from these facts were carefully excluded. It is not my business to say what weight this portion of the evidence ought to have; it is sufficient at present to say, it ought to have been received. Mutilated as it was, its force and effect must have been greatly weakened.

In addition to the general objection to the charge as to *capacity* and *undue influence*, the consideration of which we shall reserve to the close of this opinion, several specific grounds of error are assigned, i. e. that the Court erred—

1st. In assuming that not only the *execution* of the will was shown by the subscribing witnesses, but likewise the *capacity* of the testator and the *freedom* of his volition.

[5.] A Judge in the faithful discharge of his duty may, at any stage of the trial, comment upon the evidence, taking care that, in so doing, he does not encroach upon the province of the Jury, in the decision of the facts as they may think proper, in view of the evidence which *they* are to weigh. The duty of a *nisi prius* Judge, in this as in many other respects, is most harrassing and laborious, and the manner in which it is performed; in mere matters of discretion, should not be subjected to the same critical revision as dry questions of law usually are. Still, if the Judge feels it to be his duty to intimate his opinion, that a certain fact is or is not sufficiently proven, it would be better always to instruct the Jury, at the same time, to consider the evidence and to decide as they shall find the truth to be. In *Solarte vs. Melville*, (7 *Barn. & Cress.* 430,) the Court, it is true, refused to grant a new trial

on account of misdirection; yet, Lord *Tenterden*, C. J. said, " We are all, however, agreed, that notwithstanding I did intimate to the Jury my opinion upon the subject, *yet, as I left it to them to exercise their own discretion and to draw their own conclusion from the evidence*, we ought not to disturb the verdict." So, in *Gardner vs. Picket*, (19 *Wend. R.* 186,) *Cowen*, Justice, said, " The Judge's charge that there was not sufficient proof to show any assignment of the judgment to Wood, was a mere expression of opinion, *which he still left to the Jury*. He had a right to give such an opinion, *especially with such a qualification*." When we look to the charge which was objected to, we find that the presiding Judge expressly submitted the question to the Jury, about which he expressed his opinion, and *instructed them to consider the whole evidence in relation to it and decide as they should find.*

The Legislature of North Carolina have passed a Statute which requires the Judge " to state, in a full and correct manner, the facts given in evidence, and to declare and explain the law arising thereon," at the same time forbidding him " to give an opinion whether a fact is fully or sufficiently proved—such matter being the true office and province of the Jury."

It is not my purpose to discuss the wisdom and expediency of such a law. It is based upon the presumption that the declaration of the Judge's opinion on the proof of facts, *in every case*, encroaches on the proper functions of the Jury, and that in *every case* it imparts a bias to the judgment of the Jury, which they are disposed to receive with confidence and seldom make an effort to resist. I would take the liberty of suggesting, however, that the general diffusion of knowledge and education among the people of this country, much better fits them for weighing and comparing the evidence, than in any other nation or age since the institution of trial by Jury.

2d. It is complained that the Court misstated to the Jury, that Thomas T. House, one of the subscribing witnesses to the will, " testified that he understood all the testator said," and that, therefore, he was to be believed in preference to John R. Anderson and Blount C. Ferrell, the other two subscribing witnesses, as to the execution of the paper. It is possible that this witness did so testify, inasmuch as the fact is twice stated by the presiding Judge. If it be so, however, then the record before us does not contain a true narrative of what transpired on the trial. Strictly,

perhaps, no misstatement of the Court on a matter of fact, unless the comment of the Judge involved an opinion or direction in matter of law, would of itself constitute a sufficient ground for a new trial. It may, however, when connected with other irregularities in the proceedings below, be relied on in the bill of exceptions.

[6.] 3d. Another objection is, that the Court instructed the Jury, that a will made through the medium of an interpreter, might be established without the oath of the interpreter. After scanning the charge carefully, I am constrained to infer, that such was the direction given. The presiding Judge offered the following illustration: " I will analogize this case to that of a foreigner. I will suppose a German in our place, who cannot speak English and who wishes to make a will. We have a citizen, Mr. Kener, who speaks both languages. It would be perfectly competent for this foreigner to convey his wishes to the scrivener and the witnesses to the will, through the 'medium of Mr. Kener as interpreter, although Mr. Kener himself should not become a witness to the will, nor be called to testify, on admitting it to probate."

I am compelled in candor to confess, that so far as my investigation has gone, there is a great dearth of authority upon this particular point ; and I am the more astonished that it should be so, as the case must have been one of frequent occurrence. Reason would seem, however, to dictate that where there is no other medium of communication between the writer of a will and the testator, except the interpreter, that either at the time, or subsequently, he must be sworn, before the will could be established. I find this *dictum* in *Bacon's Abridgement* : " So if he that writes the will cannot hear the party speak, and another that doth stand by the sick man tells him what he says, in this case, if there be none others present to prove that he repeated the very words of the sick man, this will be no good will of the land." *Vol.* 7, *p.* 307, *letter D.* In *Gongales et al. vs. Gongales,* (13 *Lous. Reps.* 104,) the Supreme Court of Louisiana held, that a will dictated in *Spanish,* the native tongue of the testator, and a memorandum thereof taken down in the *French* language by the Notary, which was read to the testator and approved by him, as expressing his intentions, and afterwards drawn up in the *English* language, of which the testator is ignorant, but signed by him, the Notary and

witnesses, is *null* under the 1571st article of the code of that State, which requires that the will should be written by the Notary as dictated.   Judge *Eustis*, in delivering the opinion of the Court, said, " By the laws of France, notarial acts are required to be in the French language, and in cases in which the Notary and witnesses do not understand the testator, *a sworn interpreter may be called in, in order to translate.*"   Vide *Dictionnaire du Notariat, Verbis Interprête et Langue des Actes.*   And in case of *Herbert's Heirs vs. Herbert's Legatees*, (11 *Lousa. Rep.* 361,) the same Court held, that a witness to a will who does not understand the language in which the will was written, is incompetent to attest it, for the reason that it is impossible that he could compare what was written by the Notary with that which was spoken by the testator.   And Judge *Carleton*, in delivering the opinion of the Court, said, " It is sufficiently proved that Leport, (*the attesting witness*,) did not understand the English language, and, therefore, could not know whether the will contained the disposition intended by the testator.   It is impossible he could have compared what was written by the Notary with what was spoken by the testator.   He could not, therefore, testify to the faithful execution of the will, and, for all legal purposes, might as well have been absent in a distant place.   The Legislature have manifested great solicitude on the subject of last wills and testaments, and endeavored, by every possible safeguard, to insure their faithful execution.   But this wise precaution would be vain and nugatory, if witnesses were incompetent to the trust they were called to fulfil.   Language is the vehicle of thought, and if the witnesses could not understand that in which the will was written, it is plain they would be in no better situation than the deaf, who are expressly declared to be incompetent."

It is readily conceded that the exact point decided in these cases, is not that which is embraced in this record.   The principle enunciated from the authorities is the same, namely: that the paper propounded for probate must be sufficiently and satisfactorily shown to be the last will and testament of the *testator;* and the familiar maxim is, *eadem est ratio, eadem est lex.*

While it is certainly true, as suggested in the charge, that a man does not forfeit the right to make his will, because he has lost the power of speech, still, wills and testaments, whether or not they be the mere creatures of municipal law, as maintained by

Blackstone and Paley, "high legal and ethical authority," but denied by the Court of Errors of New York, in the late great case of Lispenard's will, all agree are controlled and modified by positive regulations. Each country has the undoubted right to prescribe the ceremonies and requisites which are necessary to make a will or testament completely valid; and as they derive their force and effect from the provisions of the law, they must strictly conform to its requirements. Each formality, say the Supreme Court of Louisiana, in *Knight vs. Smith*, (3 *Martin's R.* 156,) "is *sacramental* and must be rigidly complied with."

While it does not matter, then, on what material or stuff, whether on paper or parchment, nor in what language, whether in *Latin*, *French* or *Dutch*, or any other tongue, or in what hand or letters, whether in secretary hand, Roman hand, or Court hand, (which I understand means an *illegible* hand,) or in any other hand, a will may be written, still it must appear to be *the will of the testator*, and on failure to make that proof, it cannot be executed.

We hold, therefore, that if a negro interpreter, incapable by law of being sworn, is the *only* channel of communication between the testator and writer of the will, and there be no other evidence of the testator's knowledge of its contents or his assent thereto, than that which is derived through this medium, the will cannot be executed.

[7.] But if the will be written in the presence of the testator, and in a language which he understands, it is read over to him, and his dictation and approval of the instrument are interpreted by a negro in his hearing, and in the hearing of others interested in its contents, and he signifies no dissent thereto, by signs or otherwise, but on the contrary, is understood to express himself satisfied, the will may be established; especially if it appears to have been made in conformity to the previously declared intentions of the testator, as to the disposition of his property.

[8.] 4th. Another objection is, that the Court applied the rule which discriminates in favor of affirmative over negative testimony, to the facts of this case. No one doubts the general rule referred to in this exception. Indeed, the exception itself assumes the existence of it. And it may be true, that in an issue like this, where some of the witnesses testify to facts, showing understanding, this evidence will outweigh very many witnesses,

Potts and others *vs.* House.

who state only that they never saw or heard these proofs of sanity. Nay more : it may, perhaps, be granted, that affirmative facts, establishing the existence of mind, may preponderate over those which prove only its defects or weakness. Here, the matter in dispute was, whether or not the testator could measure corn, compute interest, and attend to the ordinary affairs of life? Some of the witnesses swore that he could, and others that he could not. We can see no difference in the character of these statements. Two persons are present when the holder undertakes to calculate interest on a promissory note, or measure a bushel of corn; one affirms that he did it correctly, the other denies it, and points out the inaccuracy or blunder—is there any difference in the nature or quality of this proof? None that we can perceive, and hence our conclusion that this was a misapplication of a right rule.

[9.] 5th. Another objection is, that the Court affixed a legal discredit upon the testimony of *relatives*, as such. We shall make but a solitary remark upon this point. A child is a competent witness for a parent, and a parent for a child; nor does consanguinity, or any other domestic or social relation, *necessarily* attach a stain to this species of proof. It *may* (not *must*) go to its credibility.

[10.] 6th. The last special objection is, that the Court expressed great doubt as to the *competency* of certain testimony which had been admitted before the Jury. In *Monroe vs. the State of Georgia,* (5 *Georgia Reps.* 85,) this Court held, that it was error in the Circuit Court in its charge to the Jury, to intimate *doubts* as to the *competency* of legal testimony which had been submitted to them, it being calculated to paralyze its influence in their estimation. We see no reason to change that opinion.

We will now, in conclusion, examine some of the general doctrines involved in the charge respecting wills; and I must say, His Honor, Judge *Hill,* discharged this portion of his arduous functions with equal skill and perspicuity, and we are not prepared to say that he underrated the degree of testamentary capacity necessary to make a will, in maintaining that *imbecility* of mind did not disqualify, provided it stopped short of *idiocy* or *lunacy.* Before investigating this case, I had supposed that more capacity was required to make a will than I now find warranted by the authorities; and in remanding this cause to the Circuit

for a new trial, with instructions, I am inclined to think, that we rather overrated the amount of mind which the law exacts of the testator. At any rate, I have myself more clear and definite views respecting this subject than I have hitherto entertained. Still, I find no acknowledged standard of " weights and measures" by which to regulate this as well as all similar investigations. We apprehend that this thing, from its very nature, is incapable of being fixed and determined. All attempts to draw the line between capacity and incapacity have ended where they began, namely: *in nothing*. All agree that there must be a sound and disposing mind and memory, but to define the precise quantum, *hoc opus, hic labor est.*

[11.] One thing is certain—that *eccentricity*, however great, is not sufficient, of itself, to invalidate a will. 4 *McCord's R.* 183. Mason Lee, the testator in this case, supposed himself to be continually haunted by witches, devils and evil spirits, which he fancied, were always worrying him. He believed that *all women are witches.* (In this, perhaps, he was not so *singular!*) He lived in the strangest manner—wore an extraordinary dress, and slept in a hollow log. He imagined that the Wiggins' relatives, whom he desired to disinherit, were in his teeth; and to dislodge them, he had fourteen sound teeth extracted, evincing no suffering from the operation. He had the quarters of his shoes cut off, saying, that if the devil got into his feet, he could drive him out the easier. His constant dress was an osnaburg shirt, a negro cloth short coat, breeches and leggings. His wearing apparel, at his death, was appraised at one dollar. He always shaved his head close, as he said that in the contests with the witches, they might not get hold of his hair, and also, to make his wits glib. He had innumerable swords, of all sizes and shapes, to enable him to fight the devil and witches successfully; they were made by a neighboring blacksmith. In the day-time, neglecting his business, he dozed in a hollow gum-log, for a bed, in his miserable hovel; and at night, kept awake fighting with his imaginary unearthly foes. He fancied, at one time, that he had the devil nailed up in a fireplace, at one end of his house, and had a mark made across his room, over which he never would pass, nor suffer it to be swept. He would sometimes send for all his negroes to throw dirt upon the roof of his house, to drive off ghosts. He had no chair, or table, or plate in his house. He used a forked stick. His meat

Potts and others *vs.* House.

was boar and bull beef and dumplings, served up in the same pot in which it was boiled, and placed on a chest, which answered him for both table and chair.    He made his own clothes; they had no buttons; his pantaloons were as wide as petticoats, without a waistband, and fastened round him with a rope.    His saddle was a piece of hollow gum-log, covered with leather, and of his own make.    His kennel, on which he eat, slept and dozed away his time, was three feet wide, five feet long, and four feet high.    He suffered no bull or boar, on his plantation, to be castrated.    He cut off all the tails of his hogs and cattle, close to the roots; he said the cows made themselves poor, by fighting the flies with their tails, but cut them off, and they would get as fat as squabs. He once brought a horse from home, cut off its ears, and mounted it instantly while bleeding.    He mutilated, in the same manner, all of his horses and mules.    He hoed his corn after frost, saying it would come out green again.    His bargains were peculiar, and generally losing.    He gave long credits, without interest.    He sold one place for $7,000, to be paid in 17 years, without interest, and if the purchaser did not like the bargain at the end of that time, he was at liberty to give it up, without paying rent.    He said that the land, at the expiration of the time, would be worth ten times as much as when he sold it.    He purchased a large body of poor flat pine land, without seeing it, and put his negroes there, without a hut to live in.    They cleared and girdled the trees of 2000 acres, for the purpose, he said, of planting it in pinders, (ground nuts,) by which, he said, he should make a fortune. He never went to church, nor voted, nor was required to do patrol or militia duty.    He had a sulky made; his directions were, to have the shafts exactly nine feet long, and the chair and seat to be square—the sticks of which were to be worked with a drawing knife—not turned—and the cross-bars were to be square. But enough of these *whimsicalities*.    The will was established; and upon the appeal, the supervisory tribunal, through its organ, Judge *Nott*, declared that "the evidence, (a part of which only I have quoted,) seemed very well to have authorized the verdict which the Jury rendered."

If the maxim be sound, that what is against reason, cannot be law, one might, I think, well doubt the principle of this case, without being branded as a skeptic.    I subscribe, however, to the doctrine, that it is not every man of a frantic appearance and

behavior, who is to be considered *non compos mentis*, either as it regards contracts, obligations or crimes; and that one may be addicted occasionally or habitually to the strangest peculiarities, and yet possess a testable capacity.

Not only is the greatest *singularity* insufficient to set aside a will, but it would seem that a mere *glimmering* of *reason* would be sufficient to sustain a will. *Stewart's executor, Appellant, and Lispenard and others, respondents*, 26 *Wendell*, 255. Alice Lispenard, the testatrix, was all her life, as it appears from the testimony, incapable of taking care of herself; and for the most part of it, had to be washed, nursed and put to bed, the same as a child. She had a vacant expression of countenance—a silly, unmeaning laugh, when spoken to. The carriage of her body was awkward and unnatural, and she dribbled at the mouth. She was not permitted to associate with company. Her food was put on a plate and handed to her, without asking her what she would have. When upwards of thirty-five years of age, she spent her time sitting at the window of the house where she resided, and would sit there, even when the shutters were closed, without speaking with any one. She would cry like a child, when the children of the family in which she boarded, refused to divide their candies with her. She could not be taught the Lord's Prayer, nor to read, much less, to write. The utmost length to which her education ever progressed, was to spell words of two syllables. At a later period of her life, the experiment was renewed, but the result attended with no better success; this appearing to be the *ne plus ultra* of her intellectual capacity. When her father, Anthony Lispenard, died, his will contained the following remarkable provision, with respect to his daughter Alice: " And as it has pleased Almighty God, that my daughter should have such imbecility of mind, as to render her incapable of managing and taking care of property, my will further is, that she be allowed five hundred dollars for her maintenance, during her natural life." Yet, notwithstanding all this array of facts, as summed up by the surrogate, (Campbell,) and this deliberate judgment of the father himself, who, above all others, was best acquainted with the character and mental condition of his unfortunate child—and made, too, at a period when there was nothing to harden his heart towards his daughter, or alienate his affections from her—her will, bequeathing an immense estate, was set up and established. The Court of Errors in New York, main-

taining that *imbecility* of mind in a testator, will not avoid his last will and testament; that all persons, except *idiots*, *lunatics*, and those who are *non compos mentis*, of lawful age, and not under coverture or constraint, are competent to make a will, be their understanding ever so weak. *Shelford on Lunacy*, p. 37. That Courts, in passing upon a will, do not measure the extent of the understanding of the testator; *for if he be not totally deprived of reason*, whether he be wise or unwise, he is the lawful disposer of his property, and the will stands as a reason for his actions. *Ib.* 39. That a man's capacity may be perfect, to dispose of property by will, yet inadequate for the management of other business. As for instance—to make contracts for the purchase and sale of property; and therefore, a Court of Chancery may commit the property of a person, *incapable of managing his estate*, to the charge of a committee, and yet, after his death, give effect to a will made by him, whilst laboring under such incapacity.

And I am constrained to say, after the most careful consideration, that these doctrines are in accordance with the authorities. *Swinburne*, one of the oldest, and perhaps still the best writer, upon this subject, says: (*Part 2*, §4.) " If a man of mean understanding, neither wise nor foolish, but indifferent, as it were, between a wise man and a fool, *yea, though he rather incline to the foolish sort*, so that for his dull capacity he may be termed *grossum caput*, a dunce, such a one is not prohibited to make a testament, unless he be yet more foolish, and so very simple and sottish that he may easily be made to believe things incredible or impossible; as, that an ass can fly, or that trees did walk, beasts and birds could speak, as it is in *Æsop's* fables." And *Lord Coke* defines a *non compos mentis* to be one who, by sickness, grief, or other accident, *wholly* loseth his understanding. *Beverly's Case*, 4 *Reports*, 123. *Coke's Lit.* 247, *a.* And Mr. *Senator Verplanck* thus eloquently discourses upon this subject, in the case already referred to in 26 *Wendell:*

" Taking mankind, such as observation shows us human nature to be, can any other than this be a safe, prudent, just or politic rule? When we observe the strange incongruities of human character, the astounding mixture of sagacity and weakness in the same mind, 'the fears of the brave and the follies of the wise'— when literary biography shows us the discoverers of truth and the teachers of wisdom, like Newton and Pascal, suffering under

'the variable weather of the mind, the flying vapors of incipient lu-
nacy'—when, in ordinary life, it often happens that the most sa-
gacious and prudent, in many of the affairs of business, are yet,
in some point of domestic conduct, guilty of absurdities, such as
the feeblest minds could not commit, one might almost adopt the
startling conclusion of Dr. *Haslam*, who, after years of profes-
sional observation of the phenomena of mental disease, when ex-
amined in the remarkable case of Miss Bagster, in answer to the
customary question, " Was Miss B. of sound mind ?" replied—
" I never knew any human being who was of sound mind."

" So again, if we look around our own circle of acquaintance,
every one must have known aged, blind or infirm persons, unfit-
ted, by the state of their minds, or of their senses, for the man-
agement of any affairs, and from their necessary seclusion from
the concerns of life, entertaining false notions, and mixing up the
past with the present.   Yet these, and such as these, may, by the
aid of their friends and families, upon whom they have a right to
rely, and with a general understanding of their own interest, and
the effects of their acts, make wills, conveyances, and other dispo-
sitions of property, which could not be set aside without gross and
manifest hardship and injustice.

" To establish any standard of intellect, or information, beyond
the possession of reason in the lowest degree, as in itself *essential* to
legal capacity, would create endless uncertainty, difficulty and
litigation—would shake the security of property, and wrest from
the aged and infirm, that authority over their earnings and savings
which is often their best security against injury and neglect.   If
you throw aside the old Common Law test of capacity, then,
proofs of wild speculations, or extravagant and peculiar opinions,
or of the forgetfulness or the prejudices of old age, might be suf-
ficient to shake the fairest conveyance or impeach the most equi-
table will.   The law, therefore, in fixing the standard of positive
legal competency, has taken a low standard of capacity; but *it is*
a clear and definite one, and therefore, wise and safe.   It holds,
(in the language of the latest English Commentator,) that, " weak
minds differ from strong ones, only in the extent and power of
their faculties; but unless they betray a total loss of understand-
ing, or idiocy, or delusion, they cannot properly be considered
unsound."   *Shelford.*

Again—not only are *eccentricity* and *imbecility* no just grounds

for setting aside a will, but *old age* does not deprive a man of the capacity of making a testament; for a man may make his will, how old soever he may be, since it is not the integrity of the body but of the mind, that is requisite in testaments, provided the understanding has not become destroyed, by surviving the period that Providence has assigned to the sanity and stability of the mind.    The want of recollection of names, is one of the earliest symptoms of the decay of memory, by reason of old age; but it is not sufficient to create incapacity, unless it is quite total, or extend to the immediate family and property of the deceased.    I once walked more than a hundred yards with Luther Martin of Maryland, for the purpose of being introduced to his grand-son, whom he had brought to college, without his being able to recall to his mind the name of his son-in-law, the father of the young man.    And yet, I have no idea that his faculties were so far gone and shattered, as to have lost their testamentary power.    If the testator be capable of doing an act of thought or memory, it is enough.

Jacob Bennet, the testator, was between 90 and 100 years old, when he made his will, disposing of his *negroes, (New York !!!)* furniture and stock, on his farm.    His will was executed—Chancellor *Kent* holding, that neither age, nor sickness, nor extreme distress, or debility of body, will affect the capacity to make a will, if sufficient understanding remains.    He feelingly observes, that, "it is one of the painful consequences of extreme old age, that it ceases to excite interest, and is apt to be left solitary and neglected.    The control which the law still gives to a man, over the disposal of his property, is one of the most efficient means which he has, in protracted life, to command the attentions due to his infirmities.    The will of such an aged man ought to be regarded with great tenderness, when it appears not to have been procured by fraudulent acts, but contains those very dispositions which the circumstances of his situation, and the course of the natural affections dictated."    *Van Alst and others, vs. Hunter and others,* 5 *Johns. Ch. R.* 148.

In *Brunne vs. Molliston,* (3 *Wheat.* 129,) *Huston,* J. said, " That the decedent must be presumed to be competent to make a will, until the contrary is proved—that the presumption of competency is not destroyed, by any extremity of age, though it may be weakened, where the testator is very old, and circumstances additional are proved; but taken alone, it matters not that the tes-

tator was a hundred years old, at the time of executing the will."
So, one who is deaf and dumb, whether so from infancy, or his
misfortune has been superinduced by subsequent cause, may, nev-
ertheless, make a testamentary disposition of his property.

One who is deaf and dumb from his nativity, is, in presumption
of law, an idiot, and therefore, incapable of making a will; but
such presumption may be rebutted; and if it sufficiently appears
that he understands what a testament means, and has a desire to make
one, he may, by signs and tokens, declare his testament. One
who is not deaf and dumb by nature, but being once able to hear
and speak, if, by some accident he loses both his hearing and the
use of his tongue, then, in case he be able to write, he may, with
his own hand, write his last will and testament. And if he be not
able to write, then, he is in the same case with those who be both
deaf and dumb by nature, i. e. if he have understanding, he may
make his testament by signs, otherwise, not at all. Such as can
speak, but cannot hear, they may make their testaments as if they
could both speak and hear, whether that defect comes by nature
or otherwise. Such as be speechless only, and not void of hear-
ing, if they can write, may very well make their testaments them-
selves, by writing. If they cannot write, they may also make
their testaments by signs, so that the same sign be sufficiently
known to such as then be present. 1 *Wms. Ex'rs*, 2d *Amer. ed.*
*p.* 15.

I would respectfully submit, whether, in this age of benevo-
lence, I had almost said, of the revival of miracles, when, through
the instrumentality of appropriate asylums, eyes have literally
been given to the blind, and ears to the deaf, the *presumption*
ought any longer to be against the testable capacity of mutes ?

I would only add, once more, that a man may be capable of
disposing by will, and yet incapable to make a contract, or to
manage his estate. To this point the authorities are numerous.
I will content myself to cite one only. Mr. Justice *Washington,*
in *Harrison vs. Rowan,* (3 *Wash. C. C. R.* 580,) charged the Ju-
ry, " that it was not necessary that the testator should view his
will, with the eye of a lawyer, and comprehend its provisions in
their legal form. It is sufficient if he has such a mind and memo-
ry, as will enable him to understand the business in which he is
engaged, the property he means to dispose of, the persons who
are the objects of his bounty, and the manner in which it is to be

distributed between them.  It is the business of the testator to dictate the purposes of his mind, and of the scrivener to express them in legal form ; that it was soundness of mind, and not the state of the bodily health, that was to be attended to.  His capacity may be perfect to dispose of his property by will, and yet very inadequate to the management of other business ; as, for instance, to make contracts for the purchase or sale of property. For most men, at different periods of their lives, have meditated upon the subject of the disposition of their property by will, and when called upon to have their intentions committed to writing, they find much less difficulty in declaring their intentions, than they would in comprehending business in some measure new."

James Potts, senior, the testator in this case, was about ninety years old ; was rendered almost speechless by age and the loss of his health ; was bedridden, and on account of his bodily infirmities at least, if not mental, rendered pretty much incapable of attending to and managing his ordinary business.

[12.] Perhaps there is one principle which I have failed to guard with sufficient accuracy, to wit : the distinction between oddity or caprice, as exhibited in Mason Lee, and derangement.

[13.] Because if there be partial insanity only, and the will is the direct offspring of it, it will be invalid, although the general capacity be wholly unimpeached.   And this partial insanity may be *quo ad hoc* or *quo ad hanc :* i. e. upon a particular subject, or as to a particular person.  In either case, the sound and disposing mind is deficient or wanting in regard to this particular transaction.   It is well established, both by medical and legal authorities, that a party may be both sane and insane, at *different* times, upon the *same* subject, and both sane and insane at the *same* time on *different* subjects; and it is in this last sense that the phrase *partial insanity* is generally used.

The case of *Dew vs. Clark*, is a striking illustration of that delusion, in relation to the act in question, which will defeat a will, while the testator in making it was sane in other respects and on all other subjects.   The evidence showed, that the deceased was a sensible, clever man, conducting himself, in the ordinary transactions of life and his affairs, rationally ; amassed a considerable fortune by his profession ; his friends and acquaintances, some of them medical men, never considered or even suspected that he was deranged in his mind ; yet it was shown that he labored un-

der some strange hallucination, both as to himself and his daughter. She was proved to have been always amiable in her disposition, of superior talents and engaging manners, diligent, industrious, submissive and obedient, patient under affliction, dutiful and affectionate, modest and virtuous, moral and religious; yet, in the deluded mind of her father, she was the most extraordinary instance of depravity, vileness, vice, crime, profligacy, artifice, disobedience, revolt and rebellion, and quite irreclaimable, while, in regard to himself, he considered himself a pattern of fatherly tenderness and affection, though tying his daughter to a bedpost and flogging her with the most unmerciful severity, and compelling her to perform the most menial drudgery, to which even a servant would not submit. These impressions accompanied him through life, and were recorded in his will. Neither the persuasion of friends, nor the sanction of religion, could change his mind or purpose. (8 *Watts*, 71, '2.) *Sir John Nichols*, taking a different view of both the father and daughter from what the testator did, pronounced against the validity of the will, which decree was confirmed by the delegates, and the *Lord Chancellor*, on a petition for a commission of review, refused to recommend it. *Hagg. Ecc. Rep.* 8.

If there be, then, a total deprivation of reason, from birth or subsequent calamity, whether permanently or existing only at the time of execution, the will is a nullity, however suitable and right the terms of its bequests, and with whatever good purpose and intentions it may have been made; but although the testator be not *non compos,* within the legal acceptation of the term, still, if he labor under *delusion* as to the special matter, he is not, in *that respect,* competent in the eye of the law. And while weakness of understanding is not, of itself, any objection in law to the validity of a will or contract, still, in connection with other circumstances, imbecility of mind, whether from age or disease, or any other cause, may be relied on to show that the particular will or agreement in controversy, was procured by fraud or undue influence; and less proof will be required in such case from him who alleges it.

[14.] Having said all that I deem necessary as to the degree of intelligence requisite to make a will; having endeavored to show that neither *peculiarity* of character, however extravagant, not amounting to general or partial insanity, *weakness* of understand-

Potts and others *vs.* House.

ing, nor extreme old age, nor want of hearing or speech, or the capacity to transact the ordinary business of life, such as buying and selling property, will disqualify a person from making a will, I will pass on to the only other main matter of inquiry, and that is, what degree and kind of influence, exerted over the testator in obtaining a will, is sufficient to set it aside ?

[15.] With respect to a will alleged to have been obtained by undue influence, I would remark, that it is not unlawful for a person, by honest intercession and persuasion, to procure a will in favor of himself or another ; neither is it, to induce the testator, by fair and flattering speeches; for though persuasion may be employed to induce the dispositions in a will, this does not amount to influence in the legal sense. If a wife, by her virtues, has gained such an ascendancy over her husband, and so rivalled his affections that her good pleasure is a law to him, such an influence can never be a reason for impeaching a will made in her favor, even to the exclusion of the residue of his family. Nor would it be safe to set aside a will, on the ground of influence, importunity, or undue advantage taken of the testator by his wife, though it should be proved that she possessed a powerful influence over his mind and conduct in the general concerns of life ; but where persuasion is used with a testator on his death-bed, when even a word distracts him, it may amount to moral force and inspiring fear. 4 *Greenlf.* 220.

On this subject, as on that with regard to capacity, no precise and distinct line can be drawn. Suffice it to say, that the influence exercised must be an unlawful importunity, on account of the *manner* or *motive* of its exertion, and by reason of which the testator's mind was so embarrassed and restrained in its operation, that he was not master of his own opinions in respect to the disposition of his estate.

In the case of the will of *Edward Campion, (Ex parte Fearon,* 5 *Ves.* 633,) the Court of Delegates, consisting of some of the most distinguished Judges and Civilians in England, set the will aside, on the ground that undue influence had been exercised over the mind of the testator by his physician and house-keeper ; and Lord *Roslyn,* being satisfied with their decision, reported against granting a commission of review. And in *Hacker vs. Newburn, (Styles' Rep.* 427,) *Rolle, C. J.* held, that a will executed by a man in his last sickness, by the over importunity of his

wife, and for the sake of quiet, was not valid. Perhaps we could not do better than sum up all we have to say on this topic by another quotation from *Swinburne*. It is good to draw water from the *source* rather than from the *mouth* of the stream. *Antiquas exquirere fontes.* "If the testator be compelled by violence, or urged by threatenings, to make his testament, that testament being made by just fear, is ineffectual. Likewise, if he be circumvented by fraud, the testament loseth its force. For, albeit, honest and modest intercession and request is not prohibited, yet these fraudulent and malicious means, whereby men are secretly induced to make their testaments, are no less detestable than open force." 1 *Swinb.* 22.

It is objected, however, in this case, that the testator was under the control of his *slaves*, and that this circumstance, if well authenticated, ought, *ipso facto*, to destroy the will. That while it is allowed to free white persons, whether kindred or strangers, to influence others, by proper means, to make their wills, yet that where this influence proceeds from *slaves*, it indicates such moral degradation as should induce the Courts, from motives of public policy, to avoid their acts.

As to the source whence this moral coercion comes, the law makes no discrimination, consequently we can make none. The testimony does not show that any improper intercourse existed, at the time the will was executed, or previously, between the testator and his *slaves*, or any of them; but had it been otherwise, and this will had been the result of that miserable infatuation, however shocking it might be to our sense of decency and propriety, and proper subordination on the part of our negroes, still we dare not, on that account, impeach the will, unless the Legislature should see fit, in its wisdom, to abridge the right of the owner to dispose of his property for this cause. The only inquiry for Courts is, was the testator, from the infirmity of age or other cause, constrained to act against his will, to do that which he was unable to refuse, by importunity or threats, or any other way by which one person acquires dominion and control over another? If so, the validity of the will may be impeached; and it is wholly immaterial from what quarter this undue influence which destroys free agency comes, whether from a slave or a free white person. To set aside a will because it is capricious or unreasonable, or because the testator may have selected an unwor-

thy object for the bestowal of his bounty, is to deprive him of the most cherished of all rights, namely: the right, secured by law, to dispose of his estate by will, in such way as may seem good in his own eyes.

The will of W. B. Farr was several times before the Courts of South Carolina, and its validity contested, among other grounds, because it was obtained by undue influence exercised over the testator by the executor, Dr. Thompson, and *by a negro woman named Fan, and her son, Henry;* and that it was obtained by threats made by the same persons. *Cheves' Law and Equity Reps.* 37. 1 *Richardson's Law Reps.* 80. 1 *Spear's Rep.* 93. The proof showed that Fan was the paramour, and Henry the son, of the testator; that this woman had the influence over him of a white woman and a wife. He had a clock which he cursed and said he would not have bought it but for Fan; promised to destroy a dog that killed sheep, but did not do it because she objected; bargained for a negro, but would not buy till her pleasure was consulted; sold a negro girl at her desire, and made titles to another one that she offered for sale as her own, and when he had made the titles, said "he hoped she would now be satisfied, as there was no other woman left, he hoped he would have some peace." One witness thought she had such influence that she could have had any negro sold that she pleased. At Christmas, 1835, Farr said he should not live long, and wanted to divide his property out among his relations equally. Fan said, " what is to become of me and Henry?" Farr said he would give her money enough to maintain her during her life, and she might go to a free State. She replied, "before any of the Farrs should have any of the property she would lose her life." Fan refused to let a servant come to him when called; they quarreled about it; she shook her fist in his face and threatened to knock his teeth down his throat; witness heard them quarrel in the night; heard her call Hannah, a servant, to bring her the whip and she would beat his skin off. They would get drunk together and she was insolent to him; told him to hush or she'd give him hell; cursed him for a d—ned rascal; rubbed her fist in his face and dared him to open his mouth; called him a d—ned old palsied rascal. Testator told Dawkins, that Fan had tried to kill him with a spear; she threw it at him and stuck it in the bed post; Fan was drunk and he made them make friends. Many other disgusting details

were narrated on the trial, which need not be repeated. Farr was 66 years old when he died; was originally a man of strong mind, but he was much enfeebled by hard drinking, and his memory was impaired by a stroke of the palsy; still he was capable of doing business.

Judge *Earle*, in commenting upon this case, said, "This phrase of *undue influence*, so frequently resorted to in this country by disappointed relations, to avoid wills of persons on whom, while living, they had no claims, seems *to me* to be a *modern innovation*, and is not known in the English Courts. The true inquiry always is, whether there exists the *animus testandi?* The party therefore must be free, and under no compulsion from such threat or violence, as may reasonably be supposed to move a constant man. Even in case of such constraint or fear, if when they are over, the testator confirms the will, it is made good. Applying the general rules governing such cases to that made by the proof, it will be very difficult to find the evidence either of threat or violence, of fear or compulsion, or of excessive importunity, extorting from the feebleness of age or disease, what it was unwilling to grant, yet unable to withhold."

And Judge *Evans*, when commenting on the same will, many years afterwards, said, "whenever the validity of a will is disputed, the natural inquiry is, whether it is voluntary—whether it be conformable to the wishes and previously declared intention of the testator and according to the course of his affections? When a sane man, with legal solemnities, executes a will, the law presumes, in the absence of proof to the contrary, that it was done voluntarily, and that it contains truly his wishes and intentions in relation to the disposition of his property. The burden of proof lies on him who alleges the existence of undue influence, and its exercise in the procurement of the will. I have before said that Fan was greatly indulged, and that she had some influence over the testator, arising out of her position, can scarcely be doubted. From this arose her familiar mode of addressing him, her presumptuous claim to be his wife, and her dominion over the servants and household affairs; but beyond these the evidence furnishes no proof of influence possessed or exercised, or attempted to be exercised."

It is true that the Jury uniformly found against the will, and that the Court finally acquiesced, upon the principle that, where

the case consists of facts, which have been fairly submitted to the Jury, with full instructions from the Court, their verdict concludes the case.   Still it serves to show the opinion of the distinguished Judges, who repeatedly had this case under consideration, of the nature and degree of influence which must be exerted over the testator, in order to invalidate his will; and that it matters not that the imputed control is at the instance of a slave, and that slave the mistress of the deceased, provided the testator was left a free agent.

It is only necessary to advert for a moment to the brief of the testimony in the case before us, to see how immeasurably short it comes on the score of unjust control, of that which accompanied Farr's will.   John Hill testified that he visited the testator sometime before his death; that soon after he arrived at the house, two female slaves, one an old and the other a young woman, voluntarily took their stand on each side of the testator, and on them he seemed to rely for direction.   Potts appeared to be very stupid and incompetent to transact any business.   Jesse Kinsey swore, that Potts' negroes did pretty much as they pleased, and his principal house woman appeared to exercise a controlling influence over him—she was his interpreter; his mind was not only defective, but thinks there was a want both of bodily and mental strength; he was inclined to be fickle minded and not very determined in carrying out his purposes; he was kind and indulgent to his slaves, and they obeyed or disobeyed his orders pretty much as they pleased.   James Stewart, another witness examined, stated that for several years before Potts died he thought him very much under the influence of his negro woman Lucy.  The last visit that William Harris made to the deceased, a negro woman interpreted for him.   Mrs. Jemima Slaughter did not think the testator capable of making a will, from his extreme old age, want of speech and memory, and the influence the negroes appeared to exert over him; that two of his women especially seemed to have a great control over him in all his affairs; that she has heard him consulting with Lucy in relation to his business—who was a lively, talkative, saucy girl, who generally said what she pleased to her master without reproof.   Cicero Lovelace, a medical practitioner of the botanic order, saw testator frequently a short time previous to his decease; his grown negroes all appeared to exercise more or less influence over him; on one

occasion he saw Charity and Lucy put a pair of socks on the old man contrary to his wishes; at first he resisted, they persevered and he finally yielded.   He thinks he was pretty much in the hands of these women, who nursed him, except that he would not suffer his feet washed, nor his beard shaved.   William Dougherty was several times at the house of the testator; was unable to understand him.   Once he called to pay money; a negro woman got his note out of a chest, received the money and replaced the paper with the cash in the chest, locking it and retaining the key.   Another time he wished to exchange another paper for his, when pretty much the same ceremony took place—the girl officiating entirely in the business.

Now, when it is recollected, that the main purpose of this caveat is to set aside this will on account of a bequest in it to Alonzo P. House, the grandson of the testator, who resided in the State of Alabama, and between whom and the slaves of the deceased no intimacy, much less *conspiracy*, is proven to exist, we see nothing in the whole report of this case to justify the suspicion that any undue influence whatever was practised in the procurement of this will; much less such improper influence as should be allowed to invalidate it.   That, however, will be a question of fact to be passed upon by another Jury.

Upon the whole case, we are satisfied that there was reasonable ground for prosecuting this writ of error; and that in view of all the circumstances, it would best comport with the ends of justice to order a new trial.

[16.] It is insisted, that this application for a re-hearing should be refused, provided we are convinced that justice has been done in the case.   A verdict manifestly in accordance with the weight of the evidence and the justice of the case, will not usually be disturbed on account of the misdirection of the Judge; but where, as in this case, material testimony has been excluded, erroneous instructions given by the Court to the Jury, and the proof misstated in summing up the evidence, the verdict will be set aside and a new trial granted.